Case number 13-2704, James Wallace versus Wayne County and others. Arguments not to exceed 15 minutes per side. Ms. Gorton for the appellant. Good morning, your honors. Judge Quist, good to see you again. It's been a long time. Many years. My first case with you, I believe. Your honors, good morning to you. I'd like to reserve three minutes for rebuttal. You were both lawyers. Yes, we were. I was a young lawyer starting out and Judge Quist could not have been more gracious to a young startup female lawyer. So good to see you, your honor. Members of the bench, my case involves my plaintiff, James Wallace, who was absolutely clearly fired by Wayne County and Robert Fracano because he refused to do political work for the county executive's political machine on government time. Robert Fracano is an elected official. He's been county executive since 2002. This past August, members of the panel, he was defeated in the Democratic primary. Kind of a shocker, but not based on his history. He ran an operation that has led to huge scandals, coverage in the media. Five of his direct appointees are either in this room or in the audience. I'm going to tell you why, Judge Boggs. This was the atmosphere my client worked in and this is what he was facing. I need to let you know the culture because my client was not a political operative. He was an appointee. He was a graphic designer with a young family making $50,000 a year. Here he was, your honor, on the 31st floor. I get the general idea. Fair point. I went to law school in Chicago. Fair point. He wasn't the only one fired at this time. There was a bunch, 12, 15. Talk to me about why he would say at this point that somebody else should have been fired instead of him, or do you make the assertion that all 15 were the non-political people and they were all fired for that reason? I didn't quite get that from the brief. Tell me about that because the opposite argument obviously is they're politicians and they were overstaffed. They wanted to cut down the staff. They fired a number of people. Schenck fired them. You might also tie in why you didn't sue Schenck. Let me start with that last question because it's a very good one. I didn't know until I got into discovery that Schenck supposedly was the person that fired them. I don't necessarily believe he was. That's not our theory of the case. I could amend to name Schenck. Let me just start out, if you don't mind, Judge Boggs, and go back to tell you my claims are a little bit ... The way they've been packaged by the defendant make them a little bit confusing. I have a First Amendment claim on free speech retaliation and I also have a Whistleblowers Protection Act claim. Robert Fucano had the Robert Fucano PAC, the Robert Fucano Committee, and the Robert Fucano Hope Foundation. That's the 501C3. That's his civic organization. Now, with regard to my First Amendment claim, we alleged that James Wallace being forced to work on the 501C3, which we say is a political operation, was a violation of the law. We also say that him being forced to do political work on county time is a violation of the law. But for purposes of the First Amendment argument, because the right must be clearly established, we decided, Judge Boggs, to drop out the 501C3 part of the argument. I hope that makes sense because the defendant is going to get up here and tell you with a straight face, Look, this is all about whether James Wallace had to work for the 501C3. It's not about political work. That was never an issue. How silly is that? They want you to believe that the 501C3 of the county executive is not political activity. But I'm going to go with it for purposes of the First Amendment argument. Let's carve that out of the First Amendment. But when it comes to the Whistleblowers Protection Act claim, members of the panel, both are subsumed back into the whistleblowers argument. Because under whistleblowers, I don't have to show any clearly established right. I have to show that my client had a good faith belief that the law was being violated. When I asked Mr. Schenck at his deposition, is working for Robert Fracano's 501C3, which plasters his name all over town, a violation of the law? If you're doing it on county time, he said, I don't know. In the meantime, of course, they've changed the policy and have made it prohibited to work on the chief executive's 501C3. My point to you is, defendant is completely splitting hairs and it's absurd. My client's, the pressure he was under was to work politically and to work on the 501C3. But for purposes of the First Amendment, I'm going to adopt the defendant's... The whistleblowing act itself for your client was griping about doing this work? Did he, internal complaining? He didn't really report. Okay, so here's the way it works, Judge Cook. When you work for the government, if you complain internally, that's reporting under Michigan law. Clearly. You're confirming for me. Absolutely. In fact, I have no choice. Just to let you know, I originally also filed this as what's called a public policy tort, which is that you don't report outside, you just complain internally. But we had to drop it because the whistleblowers act preempts if you work for the government. It surely does. So that's why I'm in on the whistleblowers, because my client worked for the government. If you complain internally... The griping is the act. There is no formal reporting. That's correct. And there was formal reporting, and I'll get into that. In fact, the district court judge did find, quite clearly, that my client engaged in protected activity. He, on page... I believe it's four of his opinion... I'm sorry, page 10 and 11 of his opinion, he lists six, on his own, very distinct things that my client had to go through. He says at various times in 2010, he said it was inappropriate to do work on county time. He said that he would not work on material that was... the logo paid for Robert Peccano PC was put on. He was continually yelled at. There were several meetings with his bosses where he actually, the rubber met the road, and he met with them. I'm worried about your time. Okay, good point. I want to confirm what the district court said, whether or not you ever raised the cat's paw theory. Yes, we did. And if you look at our... especially in particular, we use the words cat's paw in our motion for reconsideration. Okay, well that's after judgment. Yes, but we argued the exact same thing. We argued the cat's paw theory. But here's what I really need to get to you all with, and this is the crux of my case. The district court judge found I did not show a causal connection, because he says Matthew Schenck is the sole decision maker, and Matthew Schenck had nothing to do with any of this. That is utterly and completely false out of Matthew Schenck's own mouth. Okay, so let me jump ahead. And that's in your brief, the citations to the deposition. Absolutely. Matthew Schenck is Robert Peccano's number two. He's the chief of staff. He knew two ways. First, he was directly involved in 2010. I'm going to read briefly from his deposition on page 42. Lynn Ingram, my client's boss, came to him and indicated there was work... I'm reading from him that James would not perform because he said it was political. And they thought it was related to non-profit, so it was not political. Based on that, I had a conversation with the personnel director. My understanding is that Mr. Taylor met with James, James and Lynn, and they had this heated meeting, members of the panel. And then, at that meeting, afterward, Tim Taylor, the head of personnel, looped back with Mr. Schenck to say, here's what we told James. The meeting was recorded. It's absolutely crystal clear. And what's crystal clear is that at that meeting, which Mr. Watson's going to get up and tell you was just about non-profits, my client said point blank, once we put the Robert A. Peccano committee on something, or even the Hope Foundation, are you saying that's okay? Because James is doing these graphics. And they say to him, look, yes it's okay, and you do what we tell you to do. This meeting is all in 2010, is that correct? Yes, it is. Mid-2010. The election is in 2010, Judge Boggs. Okay, so now we go forward. And now the county, subsequently I'm going to bring Schenck back in with you. I'm going to tie up the cat's paw. We argued cat's paw after the fact. Just as an add-in, it's so clear that Schenck called the shots. Schenck knew James was complaining. Schenck set this meeting up with personnel. Tim Taylor looped back with Schenck to tell him. Counsel, let me break in. Take me back and give me your best shot, though, as to the connection between this stuff in 2010 and the firing in 2012 with a bunch of people. That's the part I have some trouble getting over. This is the sort of thing where your fact pattern, if he was fired the next day or the next week or the day after the election in 2010, I'd be a much stronger case. But because the opposite is, can they ever fire him once he's done the stuff in 2010 and they don't like him very much? Is he immune from being fired when they're firing a bunch of people? Judge Boggs, there is no case out there whatsoever that would support the theory that because you're firing other people, you can bring in the guy you want to get at. I think that's right if you have some pretty good evidence that that's what's going on. And I do. So, for example, if you start out with people saying, we're going to fire your guy and then we fire 11 more just to take them down, that's a little harder to get. Let me walk you through it. Let me walk you through what happened. I've heard most of the facts. I'm just trying to get a summary. Okay, so I take a complete exception to the fact that this thing was even any kind of a legitimate layoff. They've done many layoffs at this county. This is the first time it was just a chat between Fecano and Schenck. I want to let some people go. There's literally not a document in this record saying we have to let people go and here's how we're going to do it. There's nothing that exists. Schenck takes it upon himself to go get a list of all the appointees. He checks off some that he thinks have been complaining, Judge Boggs, over the last year or so. Who testifies to this? Schenck. Okay. Schenck. He says complaining. He says complaining. That was one of his criteria was whether somebody complained over the last year. Now, what does Schenck do? And this is completely contrary to what the district court judge found. He ignored this. Schenck goes to my client's boss, Lynn Ingram. He talks to Lynn Ingram and he asks about James. Judge Boggs, Lynn Ingram is the one who was at the meeting with the personnel director. He's the one my client constantly went to and said, they're making me do political things. Ingram is the second level up. That is, it's Downey. That's correct. Downey and Ingram are very close. Ingram's above Downey. The meeting with personnel is with Downey, Ingram, and Taylor. Schenck has driven the meeting. Okay, now we know that they're going to. Supposed to mean you're supposed to stop. I'm going to wrap up. They're going to. Supposed to mean you're supposed to stop, counsel. May I add one last sentence, though, just to. Did you reserve any time? I did. I'll cut one minute off of it. So, Ingram goes to, Schenck goes to Ingram. They discuss James. Now there's a meeting, and this is the key point, Judge Boggs, with Fecano, Schenck, Ingram, Ficore, another one of my defendants, and they sit down and they discuss who they're going to let go. Three of the people in that meeting know clearly that James has complained about doing illegal activity. This is an administration that wanted him gone, and with regard to your point about timing and temporal proximity, two weeks earlier James had been told at a meeting by Brooke Blackwell, Fecano's PR director, you cannot be trusted here, and that is in my brief. So the district judge just got it wrong. Schenck knew he was directly involved in James' complaints. He set up a meeting. Well, I'll save it for rebuttal, but Ingram has lied. Ingram said he didn't know anything about this. That's contrary to Schenck's testimony where he said I talked directly to him and he was at the meeting. Thank you, counsel. You have your remaining time for rebuttal. Good morning, Your Honors. Jerome Watson appearing on behalf of defendants, Wayne County and the five individual defendants. We submit that plaintiff's claim is woefully weak, and Judge Freeman certainly was correct in dismissing the matter. In fact, we feel Judge Freeman should have based that dismissal not only on causation but on several other grounds. Let me first talk about the Whistleblower's Protection Act. Plaintiff did not establish causation. In order to establish that, he has to do more than identify that some individuals knew that he had a dispute about activities that he was asked to do at work. There must be some evidence of retaliation, some statements, conduct, documents, something to indicate he was retaliated against. Absolutely nothing in this case. Well, he was fired. The question isn't what you just said, isn't that just the same as causation? No, I don't think being fired is causation. It's an adverse action. It's an adverse action. It satisfies the third requirement, but he has to show the causal link and to show that causal link, there's got to be some kind of evidence that these folks retaliated against him. Do you not agree that we've heard some evidence here just before you got up? No, I don't agree that there was. Maybe that's what you should address. I don't agree there was any evidence of retaliation. There were five individual defendants. Three of them had nothing whatsoever to do with the termination. Denha, Fakuri, Downing weren't consulted, said they had nothing to do with the termination, and that's undisputed in this record. The fourth was Ingram, who was Downey's boss. Downey was the plaintiff's boss. Ingram was Downey's boss. What Ingram testified in his deposition is that he couldn't remember giving any input to the decision-maker, Mr. Schenck. Now, Mr. Schenck says, well, I talked to the department heads, and I think I talked to Ingram, but Ingram's position was that all his people should be kept, and that all included Mr. Wallace. So Ingram's overriding position was that all his people should be retained, none should be terminated. Schenck, however, questioned Ingram. He said, well, look, this guy does graphics and photography. Can't we hire someone on an independent contractor basis to do graphics? Can't we hire a student to do photography? Ingram had to admit, yes, we could do that, but that is not enough to show Ingram retaliated. Wasn't Ingram supposed to be at this first meeting? They focused on this first meeting with Schenck, Ficano, some other folks. Was Ingram in that meeting? Ingram was there. The undisputed testimony is that he was there. There was some kind of communications crisis, and he had to leave early before they even got to Mr. Wallace's name. And, in fact, the folks at the meeting couldn't recall Mr. Wallace being discussed. There were 30 folks on the list. It was a 45-minute meeting, and not everyone was discussed. And Mr. Wallace wasn't high on the totem pole at the county. The real evidence of retaliation, supposedly, is in regard to Ficano and in regard to Schenck. As to Ficano, the evidence is undisputed that Ficano said, for budgetary reasons, we're going to have another reduction in force. He told Schenck to handle it. The guy who had handled it was no longer with the county. That was Mr. Taylor. Schenck put together a list of 30 individuals. There was a meeting, preliminary meeting, that Judge Boggs just mentioned, where these 30 individuals were supposedly discussed. Out of that meeting, Schenck got directions, talked to more people, pared down this list somewhat, pared it down, took the list back to Ficano. Ficano said, okay, as is. Ficano added no one to the list, didn't subtract anyone from the list. As far as we know, didn't even mention Mr. Schenck. That's not enough to show Ficano retaliated. The part where your adversary says, at least asserts, that Schenck said he was checking off people who were complaining. That's not true. What's the provenance of that? Is that from a deposition? Yeah, it's from the deposition, and it was discussed in the judge's opinion. The judge noted that Schenck flagged 30 names, and then he quotes from the deposition, Schenck's deposition, based on either complaints I heard about them over the years to ask a question if they were improved or not, if it was in an area where I thought it was less significant to the operation. Okay, I read that. That's at page 5, so that it's not that they were complaining, it was in part that there were complaints about people. And their job performance. I take it could be every kind of complaint, right? Correct. They're not a good worker, they have BO, or are not doing politics. That could be a complaint also. Any type of complaint. But it's not specific to that. Correct. I mean, I'll ask your adversary as well if that's the phrase that she's referring to. Okay, go ahead. And then in regard to Mr. Schenck and his alleged retaliation, the key involves this meeting that took place actually in February 2011. What happened is that there was a dispute between Downey and the plaintiff, Mr. Wallace, over what was really political work. And Downey's position was, look, Wallace, you're being told to do this nonprofit charitable work on the job, and it's perfectly permissible that you could do that on county time. There's good evidence, though, Mr. Watson, of the complaining, the undercurrent that we're told about by your colleague here about his being a complainer. Yeah, he was. They had to have a meeting to discuss that he was concerned and griping about having to work on that. That's true. He was griping about this work. And what happened was they had a meeting. It wasn't that the work was hard. It was that it was political. He said it was political. That would mean that we're looking for the nature of his criticism. Yeah. Our position is it's not political, and it was straightened out. What happened was they had the meeting. They went to Schenck. He referred it to HR. It wasn't his area. So HR, Tim Taylor, had a meeting with all of them, with Wallace, Ingram, Downey, and Taylor, the HR director. Mr. Wallace surreptitiously taped that meeting, so we know exactly what happened. The results are telling. What happened is four times at that meeting, Mr. Taylor told Mr. Wallace, if you ever have any complaint, this is February 2011, you come to me. Whoever is pressuring you to do this, if it's political work, will get in trouble. You won't get into trouble. Not one time did he come to Taylor after that. Not one time did he complain after this February 2011. On two occasions he was asked, is there anything else you want to add? Not one time did he add anything. Further, there was nothing political discussed at the meeting. It was all about non-profit charitable civic stuff. He didn't bring up anything political. Then he made a telling admission. He said to Downey... We have the controversy about whether this 501c3 should be considered political. That's a regulatory or legal dispute between the people, right? That was an issue. It's our position that in regard to that with a 501c3, by law they cannot do political work. We know that about 501c3s. Other laws were broken. If your side is right, then that's correct. If his side, then maybe they were bending the line. Our position is as a matter of law, he could be asked to do and forced to do, required to do charitable civic work on county time. That wasn't a violation of any law, any county policy, or anything else. He admitted at that meeting that Downey did not cross the line. I forget the exact quote, but he used that word. Downey did not cross the line. So he basically admitted that the county's position was correct in that. His was not. After that meeting, no further complaints. We don't think there was any causation. We don't think he ever reported a violation. Now, there was the griping or the complaining between he and his supervisor. Under the county's policy, if you wanted to report, you were supposed to go to the inspector general, the head of HR, or the ethics commission. There was one other. He admits he went to none of those entities. He just complained with his supervisor. They had a dispute about it. We have a statement of Michigan law. Your adversary said, I think correctly, that an internal complaint can be a whistleblower activity. Do you have any law about even your supervisor is a whistleblower activity or that it needs to be through some approved channel other than just a fuss with your own foreman or supervisor? We believe it's got to be more than a fuss with your own supervisor. I said, do you have any law or regulation? There was one case we cited, the Mortimer case. That was a case where a probate judge's clerk had an argument with the judge about the judge appointing certain attorneys to certain positions. And later on, the clerk says, you don't have authority to do that. She didn't report it to anyone, but there was a dispute with the judge. She gets fired later on. She brings a whistleblower's action. The Michigan Court of Appeals in this unreported Mortimer decision decides, you didn't report. That was not a report. And I think that was what was going on here. We also feel that Mr. Wallace admitted numerous times that he didn't make a report. He got the policy. He acknowledged getting the policy. There was an annual letter that went out, letter of understanding that goes out to county employees. That letter of understanding reiterates the political activity policy. You can't work on campaigns or you can't work on partisan politics during county hours. This annual letter is sent to the employees. Mr. Wallace received the letter. He signed it, and through signing, he admits he's certified, certified that he didn't violate the policy himself and that if there were any unreported violations, well, let me say that again. Through the signature, he's certified that he didn't violate and he was not aware of any unreported violations. He signed that every time it was given to him. When I asked him in his deposition, why did you sign this letter if you're saying you were being pressured yourself to do political work on county time? He said, well, I was afraid of being retaliated against. As a matter of law, the First Amendment retaliation provisions and the Whistleblower Protection Act provisions protect those employees who report, who stand up and report wrongdoing.  And that's what he said time and again in his deposition. He was too afraid to report. Now, in the plaintiff's brief, we're attacked because we say he didn't report. And they say, oh, that's ridiculous. He reported these political activity. And we did draw a distinction between political and nonprofit. In his deposition, several times he said, I was pressured to do political work on the job. When I deposed him and asked him, what political work are you talking about? After he hemmed and hawed and danced around, it always got back to nonprofit work, Little League ad. He had to put Fecano's logo on that. Or a letter to the governor talking about the CEO's authority. Or in the dispute between Wayne Circuit Court and the county exec, the court said it was underfunded. There was a full-page ad that Wallace helped prepare and Fecano paid for and put his logo on it. The fact that Fecano would pay for these ads out of his political PAC money does not turn that endeavor into political activity. It was county activity. It might have been nonprofit activity. It was not political activity. And the law bars the political activity. As to the First Amendment claim, we rely on the same basis, the lack of causation. Really, he didn't establish. He participated in protected activity. And we also rely on qualified immunity. I'll stand on my brief on all those. In closing, I would just like to say that both the Whistleblower's Protection Act and the First Amendment retaliation provisions are geared to protect employees who stand up and report violations of law. And they're justified in punishing the employers who retaliate against these individuals. Time and again, Mr. Wallace had an opportunity to stand up, to refuse to sign the annual letter, or to state to his bosses that this is political activity. Judge Quist has a question. A quick question. Ms. Gordon said that the cat's paw theory was preserved in the lower court. What's your response to that? It was never mentioned specifically by Judge Friedman. Our response is it wasn't preserved because it wasn't brought up prior to his granting the motion for summary judgment. And anyway, with cat's paw, that's a situation where someone has a complaint and voices that to the decision-maker, and it influences the decision-maker's decision. In this case, Schenck put together the list himself before any input from the folks who supposedly had the complaint about Wallace. Anything else? Thank you, counsel. Thank you. Ms. Gordon, I have three quick questions, and you can weave them into your response. The questions are before her time starts. Number one, when you said that Schenck had a list of people who were complaining, are you referring to the same thing on page five, the quote at page five of the judge's opinion? Second question is, who's the cat in the cat's paw? Is it Ingram, or is it Downey, or is it something else? And the third question is, do we have to decide the question of whether the 501c3 work is political in order to resolve this case? So you can work those in with whatever else you have. No, you do not have to decide whether the 501c3 is political. On the Whistleblowers Protection Act, all I have to show is that my client had a good-faith belief. I think we can all agree that's a good-faith question. Schenck couldn't say it was not. He agreed. Who is the cat's paw? The cat's paw is Ingram. Ingram and Schenck. But it's not really cat's paw, members of the panel, and that's why I don't want you to focus too much on this. Ingram was at the termination meeting. Cat's paw is when you rely on somebody who's behind the scenes. Ingram was at the termination meeting. Schenck talked to Ingram directly. My client talked to Schenck directly. My client let Schenck know directly he was horrified. That's when Schenck said, this might be a disciplinary matter because you might be refusing to work. And he sent him to HR potentially to be disciplined. I'm sorry, when you said he was at the meeting, do you mean with the termination, this is the first meeting with Ficano and others where he either did or didn't leave early? Good point, Judge Boggs. So there's two pivotal meetings. Right, because the other meeting is earlier, the one with Taylor. That's back in 2011. Understand Schenck and Ingram are both involved in that meeting. Ingram attends. That meeting being the 2012 meeting. The 2011 meeting with HR. That one I understand. But the quote termination meeting is the 2012 meeting. Yes. Okay. I think it's actually late 2011. It was announced in early 2012. Yes. So it's really not cat's paw to the extent that Ingram, Ingram was at the HR meeting, which Schenck set up. Schenck knew, knew, knew my client was complaining about doing political activity. Uncontested. They wanted to say, oh, he was really complaining about 501c3. Here's how they're wrong. They want to say he was complaining about 501c3. If you read the transcript of the meeting, my client goes right in and says, I don't want to be doing these things. And they say, oh, that's 501c3. But it's not. And I'm going to give you a very quick example. The Grosse Pointe Little League book. We've read about the Little League. Well, Schenck admits that the... We've read that. Okay. Time's expired, but... One last question, Judge Boggs, about the complaints. I'm going to read point blank how the complaints were a factor. This is the answer from Schenck. Based on either complaints, I had heard about them over the years. Schenck, page 147. That's complaints he heard about people, as opposed to I knew that they were complaining. Ah, but Ingram had complaints about my client, you see, Judge Boggs. Ingram had complaints about my client. I understand that, but the tone was that all of these 30 were complainers themselves, and that's not what the quotations support. Nobody has ever said James Wallace was a complainer about anything other than political. Any other questions? I don't think we heard why Schenck is not a defendant. He doesn't need to be for the whistleblowers. I'm against the county for the whistleblowers. You did hear me say earlier that when I filed the case, before I took discovery, I did not know what the county was going to say his role was, and I named Ingram and Downey, and I would like an opportunity to amend if the panel is stuck on that. That would be the First Amendment only, Judge Cook. That would not be whistleblowers. I do not name a single individual under whistleblowers. That's the answer. Thank you very much. Thank you, counsel. The case will be submitted.